# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00162-CV

---

**Great American Insurance Company of New York, Appellant**

**v.**

**Williamson County, Texas, Appellee**

---

### FROM THE 480TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 22-1359-C368, THE HONORABLE SCOTT K. FIELD, JUDGE PRESIDING

---

### O P I N I O N

In this permissive appeal, Great American Insurance Company of New York—the surety on a performance bond it issued to a construction contractor—appeals from the trial court's denial of its summary-judgment motion seeking to dismiss the lawsuit of Williamson County, Texas, for the County's alleged failure to file its suit on the bond within the statutory limitations period. *See* Tex. Gov't Code § 2253.078(a) ("A suit on a performance bond may not be brought after the first anniversary of the date of final completion, abandonment, or termination of the public work contract."). The controlling legal issue is whether Great American conclusively established that the subject public work contract was "terminated"—as that term is used in the statute and in the context of the facts and governing instruments here— more than a year before the County filed suit. Determining that Great American did not meet its

burden and as explained below, we affirm the trial court's order and remand this cause for further proceedings.

## BACKGROUND

The parties' dispute stems from a park development project initiated by the County. In 2018, the County entered into a public work contract (titled "Agreement Between Owner and Contractor") (Agreement) with Ritter, Botkin Prime Construction Company, Inc. (Prime, or the Contractor) for the construction of River Ranch County Park Phase 1 Development (Project). *See id.* § 2253.001(4) (defining "public work contract"). The Agreement sets the "Contract Price" at $11,040,192.26. The Agreement incorporates by reference several documents—the "Contract Documents"—including, as relevant here, the County's Uniform General Conditions for Williamson County (General Conditions), a forty-page document. The General Conditions define several terms used therein: the "Contract Documents" consist of the Agreement and those documents listed or enumerated therein, which together "form" the "Contract for Construction" (or "Contract" for short); the "Owner" is the County; the "Contractor" is "the person or entity identified as such in the Agreement" (i.e., Prime); and the "Work" is "the construction and services required by the Contract Documents."

Pursuant to the General Conditions and Chapter 2253 of the Texas Government Code, Prime was required to obtain a performance bond to protect the County should Prime default on its contractual obligations. *See id.* § 2253.021. The General Conditions provide that "prior to commencing the Work," the Contractor "is required to tender to Owner performance and payments bonds, as required by law." The General Conditions also provide that (1) the performance bond "is solely for the protection of the Owner" and is "conditioned on the faithful

2

performance of the Work in accordance with the Contract Documents," (2) the bond's form "shall be approved by" the County, and (3) "[i]f for any reason" a statutory performance bond "is not honored by the surety, the Contractor shall fully indemnify and hold the Owner harmless of and from any costs, losses, obligations or liabilities it incurs as a result." The General Conditions specify that if the Contractor fails to provide the requisite bonds "within the time provided by the Agreement," the Owner may "immediately" and at its "sole option and discretion" void the Agreement in its entirety or procure such bonds on the Contractor's behalf, deducting such amounts from the Contract Price.

The General Conditions contain the following section directly relevant to the parties' dispute:

§ 14.2 TERMINATION BY THE OWNER FOR CAUSE

§ 14.2.1 The Owner may terminate the Contract if the Contractor

.1 fails to commence the Work in accordance with the provisions of this Contract,

.2 fails to prosecute the Work to completion thereof in a diligent, efficient, timely, workmanlike, skillful and careful manner and in strict accordance with the provisions of the Contract,

.3 fails to use an adequate amount or quality of personnel or equipment to complete the Work without undue delay,

.4 fails to perform any of its obligations under the Contract,

.5 fails to make prompt payments when due to its Subcontractors and Suppliers, or as required by Texas Government Code 2251,

.6 files any petition or other pleading seeking any relief under any provisions of the Federal Bankruptcy Act, as amended, or any other federal or state statute or law providing for reorganization of debts or other relief from creditors, permits a receiver or other person to be appointed on account of its insolvency or financial condition, or becomes insolvent,

3

.7 creates any situation or state of facts which would authorize or permit an involuntary petition in bankruptcy to be filed against Contractor, or

.8 has not met or in Owner's opinion will not meet the dates of Substantial Completion set forth in the Contract Documents.

§ 14.2.2 When any of the above reasons exist, the Owner, in its sole and absolute discretion, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, 30 days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

.1 Exclude the Contractor from the site and take possession of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

.2 Accept assignment of subcontracts pursuant to Section 5.4; and

.3 Finish the Work by whatever reasonable method the Owner may deem expedient. Upon written request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

§ 14.2.3 When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished. In the event that a final decision under section 15, below, is rendered that sufficient cause did not exist for termination under this section 14.2, then the termination shall be considered a termination for convenience, under section 14.4, below.[1]

Great American issued the subject performance bond (Bond) to Prime. The Bond identifies Great American as the "Surety," Prime as the "Contractor," the County as the "Owner," and the Agreement and "all documents that comprise the [A]greement" as the "Construction Contract." That is, the Construction Contract as identified in the Bond is one and the same as the Contract for Construction identified in the General Conditions (i.e., the

---

[1] Section 14—"Termination by the Owner for Convenience"—permits the County to, at any time, "terminate the Contract for [its] convenience and without cause." When the Contractor receives written notice of the Owner's election under this section, the Contractor "shall" cease operations and terminate all existing subcontracts and purchase orders. The Contractor then is entitled to specified amounts as provided in Section 10.1.3 of the General Conditions.

Contract).  The Bond specifies a bond amount equivalent to the Contract Price and specifies that the Surety's obligations under the Bond arise after two conditions have been met: (a) "the Owner declares a Contractor Default, terminates the Construction Contract[,] and notifies the Surety" and (b) "the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract."[2]

The Bond specifies in Section 4 that upon such Contractor Default, termination of the Construction Contract, and notice to the Surety, the Surety "shall promptly and at the Surety's expense take one of the following actions:" (1) arrange for the Contractor, with the Owner's consent, to perform and complete the Construction Contract; (2) undertake to perform and complete the Construction Contract itself, through its agents or independent contractors; (3) obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract; or (4) waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness either (a) investigate and determine the amount for which it may be liable to the Owner and make payment as soon as practicable or (b) deny liability in whole or in part and notify the Owner of the reasons therefor.  The Bond also provides that "[i]f the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under

_____

[2] It also provides a third condition after which the Surety's obligation arises: the Owner provides notice to the Surety that the Owner is "considering declaring a Contractor Default" and provides an opportunity for a conference among the Surety, Owner, and Contractor "to discuss the Contractor's performance."  Any conference thereunder must occur within ten days of the Owner's notice.  However, Section 4 of the Bond provides that the Owner's failure to comply with this notice requirement "shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice."

this Bond, except when applicable to participate in a conference [to discuss the Contractor's performance if the Owner is considering declaring a Contractor Default] as provided in Section 3." Further, the Bond provides that the "Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference."

In its original (live) petition, filed August 17, 2022, the County sued Prime for breach of contract and Great American for failure to perform its obligations under the Bond. Great American filed a Rule 91a Motion to Dismiss Baseless Cause of Action, *see* Tex. R. Civ. P. 91a and, subject thereto, an original answer. The trial court denied the Rule 91a motion, and Great American later filed a motion for summary judgment, asserting that there is no genuine dispute that the County failed to file suit within the one-year limitations period following the termination of a public work contract. *See* Tex. Gov't Code § 2253.078(a). Great American argued that the County undisputedly terminated Prime from the Project on June 2, 2021, yet failed to file suit until August 17, 2022. It argued that accrual is a question of law for the court to decide and that the plain language of the governing limitations statute demonstrates that the County's cause of action accrued as soon as it terminated Prime and the Contract and that the County's claim against Great American is thus legally barred.

Great American attached several exhibits to its summary-judgment motion: the declaration of Paul Wischer, a former employee of Great American who supervised its response to the County's Bond claim; copies of the Agreement, General Conditions, and Bond; a June 2, 2021 letter the County sent to Prime (identified in its subject line as "Notice of Termination"); a June 2, 2021 letter the County sent to Great American; copies of periodic correspondence between Great American and the County spanning August 5, 2021 to January 5, 2022; and the

6

declarations of James Brotherston, a Great American employee in the Claims Department of the Bond Division and a records custodian for the company, and Mike F. Pipkin, an attorney for Great American and records custodian for the company. The June 2, 2021 letter that the County sent to Prime stated, in relevant part, "Please be advised . . . Prime . . . is hereby terminated from the above-described project, and demand for performance shall be made on its bonding company." The June 2, 2021 letter that the County sent to Great American stated, in relevant part, "On this date, the Owner declared . . . Prime . . . in default on the . . . [P]roject and terminated the contract. The Owner is hereby making demand on Great American . . . to honor its performance obligations arising out of" the Bond.

The trial court denied Great American's motion for summary judgment. Thereafter, Great American filed a motion for permissive appeal, which the trial court granted in its Amended Order Denying Defendant's Motion for Summary Judgment, identifying the following "controlling question of law to be considered on appeal":

> Whether the termination of a bonded contractor's right to continued performance constitutes termination of the public work contract thereby triggering limitations on a performance bond claim against a surety under section 2253.078 of the Texas Government Code when the surety's performance bond is expressly included as part of the "public work contract," and the summary judgment evidence establishes that the surety's performance commenced upon termination of the contractor and continued until December 23, 2021.

This Court granted Great American's petition for permissive appeal, *see* Tex. Civ. Prac. & Rem. Code § 51.014(d); Tex. R. App. P. 28.3, and the parties filed their briefing accordingly.

## DISCUSSION

In one issue, Great American argues that the trial court erred in denying its motion for summary judgment because the evidence conclusively established that the statutory

7

one-year limitations period had expired before the County filed its suit.[3]  It specifically argues, as it did in its summary-judgment motion, that the County "terminated" the Contract with Prime on June 2, 2021, by terminating Prime's right to continue performing under the Contract, triggering the one-year limitations period.  The County responds, and the trial court agreed, that the Contract was not "terminated" until December 23, 2021, when Great American sent a letter to the County electing to waive its right to complete, arrange for completion, or obtain a new contractor to complete and perform the Contract under Section 5.4.1 of the Bond and offering to allocate $375,647 towards completion of the estimated remaining Work.  Until that date, the County argues, Great American was "performing" the Contract under the Bond's terms, and the Contract was still operative because Great American had not yet finally informed the County that it would not be further involved in completing the Work required by the Contract.

Chapter 2253 of the Government Code, titled "Public Work Performance and Payment Bonds," governs performance and payment bonds issued to protect governmental entities when contracting for the construction of public works.  *See generally* Tex. Gov't Code §§ 2253.001–.079.  Because the limitations period is prescribed in Section 2253.078(a), and—relevantly here—is alleged to have been triggered by "termination" of the Contract, we turn first to that statute's text:

> A suit on a performance bond may not be brought after the first anniversary of the date of final completion, abandonment, or termination of the public work contract.

---

[3] "A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense."  *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).  This burden includes conclusively establishing when the cause of action accrued.  *See Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 833–34 (Tex. 2018) (per curiam).  We review de novo whether Great American met its burden.  *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017).

*Id.* § 2253.078(a). Chapter 2253 does not define "final completion," "abandonment," or "termination" but does define "public work contract" to mean "a contract for constructing, altering, or repairing a public building or carrying out or completing any public work." *Id.* § 2253.001. There is no dispute that the Contract is a public work contract under Chapter 2253. However, the parties dispute (1) whether the Bond is included as part of the Contract; and (2) whether the County's termination of Prime's right to continue performing the Contract, and its notification to Great American that it had therefore "terminated" the Contract, constitutes "termination" of the Contract as contemplated by Section 2253.078(a).

### *Is the Bond included as part of the Contract?*

We turn first to the question of whether the trial court properly concluded that the Bond is included as part of the Contract. As described in the Background section supra, the Agreement expressly incorporates the General Conditions, which specify that the Contract Documents (necessarily including the General Conditions) "form" the Contract. The General Conditions, in turn, specify that a performance bond is required, in a form approved by the County and solely for its protection. Should the surety fail to honor the bond "for any reason," the General Conditions require Prime to fully indemnify and hold the County harmless of and from any costs, losses, obligations, or liabilities incurred as a result. An indemnity agreement is a promise by the indemnitor (here, Prime) to safeguard the indemnitee (here, the County) against future loss or liability, or both. *See MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005, pet. denied). Therefore, Prime obligated itself to indemnify the County for any losses it may incur as a result of Great American's failure to fulfill its Bond obligations, even though Great American is not a party to

9

the Agreement.  Additionally, per the General Conditions, Prime may not begin performing the Contract until it has tendered the requisite bond to the County, and if and when the County opts to terminate Prime's employment for one of the reasons enumerated in the General Conditions (i.e., for cause), the County's right to finish the Work by "whatever reasonable method" it deems "expedient" is expressly "subject to any prior rights of the surety."

The Bond, in turn, expressly incorporates by reference the Contract; provides that Great American has "no obligation" under the Bond if Prime performs the Contract; binds both Great American and Prime "jointly and severally" for the performance of the Contract; and authorizes Great American, upon Prime's contractual default and the County's satisfaction of the conditions precedent in the Bond triggering Great American's obligations, "to perform and complete the Construction Contract itself," among other options.  Such authorization in the Bond for Great American to itself perform and complete the Contract is, in the context of these related instruments, necessarily one of the surety's "prior rights" referenced in the General Conditions, and Great American's exercise of such right contractually preempts the County from itself finishing the Work.  Given these interrelated provisions in the General Conditions and Bond that reference one another and that define the Surety's, Contractor's, and Owner's respective rights and remedies based in part on one another's actions under those instruments, the only reasonable conclusion is that the Contract not only expressly contemplates the existence of a performance bond but also "includes" the Bond that was executed here, as determined by the trial court.

This conclusion aligns with the primary concern of a court in construing a written contract: to ascertain the true intentions of the parties as expressed in the instrument.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see Beard Fam. P'ship v. Commercial Indem. Ins.*, 116 S.W.3d 839, 846 (Tex. App.—Austin 2003, no pet.) ("Because they are contracts,

performance and payment bonds are construed to effectuate the parties' intentions."). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.*; *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

"We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). "The intent of the parties to a surety bond as well as their rights and obligations are determined by the language of the bond itself," and when a performance bond incorporates the terms and conditions of a construction contract, any conflicting clauses must be harmonized to reflect the intent of the parties. *Beard Fam. P'ship*, 116 S.W.3d at 846. Furthermore, "when a document is incorporated into another by reference, both instruments must be read and construed together." *St. David's Healthcare P'ship, LP v. Fuller*, 627 S.W.3d 707, 712 (Tex. App.—Austin 2021, pet. dism'd); *see DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999) ("All writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another."). This rule may apply even if the various contracts are not between the same parties. *Language People, Inc. v. Barish*, No. 03-18-00538-CV, 2019 WL 5057659, at *3 (Tex. App.—Austin Oct. 9, 2019, no pet.) (mem. op.) (citing *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981)).

The particular business activity sought to be served here is the completion of a public work by a County through its hired agents such as Prime, and such activity—to the magnitude conducted here, i.e., with a contract price of over $50,000 (per the General Conditions)—is of such interest to the public that the legislature has expressly required the execution of both performance and payment bonds to protect the County and to ensure that such projects are timely and competently completed. *See* Tex. Gov't Code § 2253.021 (specifying when performance and payment bonds are required). Moreover, the Contract and Bond are writings that not only pertain to the same transaction but also expressly refer to one another. We must, therefore, consider and construe them together to harmonize all the provisions contained therein and give them the effect that most closely reflects the parties' intent as expressed therein. *See DeWitt Cnty. Elec. Coop*, 1 S.W.3d at 102; *Beard Fam. P'ship*, 116 S.W.3d at 846.

This conclusion is also mandated given the context of suretyship law in which this transaction occurred. Unlike a liability-insurance contract that involves only two parties—the insurer and the insured—suretyship "involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee." *Great Am. Ins. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 418 (Tex. 1995). In accordance with this principle, a surety's liability is derivative in nature and depends on the principal's liability. *See Wright Way Constr. Co. v. Harlingen Mall Co.*, 799 S.W.2d 415, 426 (Tex. App.—Corpus Christi–Edinburg 1990, writ denied). A surety "stands in the shoes" of its principal in the event of default by the principal on its performance of the contract. *See Beard Fam. P'ship*, 116 S.W.3d at 845. Also, when, as here, a performance bond expressly incorporates by reference a construction contract, such incorporation by reference evinces the parties' intent to make the surety aware of the

12

contractor's obligations that the surety is guaranteeing so that its performance will be pursuant to the same contractual terms as those in the relevant construction contract. *See Trans-Vac Sys., LLC v. Hudson Ins.*, No. 08-22-00232-CV, 2023 WL 4146295, at *6 (Tex. App.—El Paso June 23, 2023, no pet.) (mem. op.).

Finally, the definitions of "prime contractor" and "public work contract" in Government Code Chapter 2253 support the conclusion that the Contract includes the Bond. A "prime contractor" is a "person, firm, or corporation that makes a public work contract with a governmental entity," and a "public work contract" is a contract "for constructing, altering, or repairing a public building or carrying out or completing any public work." While Prime, as the "prime contractor" here, is the party that *made* the subject public work contract with the County, the statutory definition of public work contract broadly covers any contract for "carrying out or completing any public work," and such definition does not foreclose that there may be more than one party responsible for carrying out or completing that public work, as the interrelated instruments here expressly contemplate: that is, Great American pledged to be jointly and severally liable with Prime for performance of the Contract and completion of the Work, and it pledged so with the express approval of the County and under the requisite statutes. Joint and several liability arises in contract based on the relationship between the parties and the existence of what amounts to joint promises, that is, the rights and duties created by promises of the same performance. *See CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675, 684 (Tex. App.—Austin 2005, no pet.), *overruled on other grounds by Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145 (Tex. App.—Austin 2017, pet. denied).

For all these reasons, we consider the Bond and Contract together in determining whether "termination" of the Contract occurred and agree with the trial court that the Bond was

13

"expressly included as part of" the Contract. We thus turn to the second question: whether the County's termination of Prime's right to continue performing the Contract, and its notification to Great American that it had therefore "terminated" the Contract, constitutes "termination" of the Contract as contemplated by Section 2253.078(a).

### *Did the County's termination of Prime's employment constitute termination of the Contract?*

We initially recognize that the date a cause of action accrues is a question of law, and when a statute provides for a specific accrual date, that statute governs. *See Southwestern Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016). Because Section 2253.078(a)'s limitations period is triggered by certain outcomes pertaining to a particular public work contract—i.e., final completion, termination, or abandonment thereof, *see* Tex. Gov't Code § 2253.078(a)—it follows that to determine whether and when such outcomes have occurred, and thus whether a cause of action has accrued, we must look to the statutory text as well as the provisions of that contract and the facts and circumstances allegedly constituting one of those outcomes. What constitutes "termination" of a particular public work contract is an issue involving both statutory construction and contractual construction, which we review de novo. *See McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003) (statutory construction); *Coker*, 650 S.W.2d at 393 (contractual construction). While neither the County nor Great American argue that the Contract's or statute's use of the word "termination" is ambiguous, they offer conflicting constructions. In such a case, if only one party's construction is reasonable, the instrument or statute is unambiguous, and we will adopt that party's construction. *See Iliff v. Iliff*, 339 S.W.3d 74, 79 (Tex. 2011) (statutory construction); *Davis v. Homeowners of Am. Ins.*,

14

No. 05-24-00035-CV, 2025 WL 1031926, at *7 (Tex. App.—Dallas Apr. 7, 2025, no pet.) (mem. op.) (contractual construction).

In reviewing the legislature's use of the word "termination," we rely on the plain meaning of the text unless another meaning is statutorily supplied or apparent from the context, and we construe the statute as a whole rather than reading individual provisions in isolation. *Live Sys., LLC v. Hartford Fire Ins.*, No. 02-23-00238-CV, 2024 WL 190727, at *2 (Tex. App.—Fort Worth Jan. 18, 2024, no pet.) (mem. op.). Chapter 2253 does not define "termination," and thus we look to its common, ordinary meaning. *See University of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 52 (Tex. 2015). In common usage, "termination" means the "end in time or existence" and "conclusion." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/termination (last visited July 18, 2025); *Termination*, Black's Law Dictionary (12th ed. 2024). Section 2253.078 specifies that a cause of action on a performance bond accrues—and the statute of limitations begins running—when the subject public work contract concludes or when its existence comes to an end.

Applying such concepts to the Bond and Contract, which we must read together and harmonize, we conclude that Section 2253.078(a)'s phrase "termination of the public work contract" cannot reasonably mean Prime's termination from the Project as Contractor, the County's notification to Great American that the Contract "was terminated," and the County's demand that the surety "honor its performance obligations" under the Bond. While both the General Conditions and the Bond use the phrase "terminate the Contract" in reference to the County's right to declare a Contractor default due to enumerated reasons, other provisions therein clarify that such declaration of Contractor default does not equate to termination of the Contract in its entirety and that the Contract survives the County's termination of the

15

Contractor's employment.  The end of Prime's employment does not mean, under the undisputed facts here, that the Contract's existence had come to an end.  We conclude so for several reasons.

First, the General Conditions—in the very next section after enumerating acceptable reasons to "terminate the Contract"—specify that when one of those reasons exists, the County may "terminate employment of the Contractor" and, "subject to" the Surety's rights to perform and complete the Contract, "finish the Work" itself.  If the County's termination of the Contractor's employment due to default also constituted termination of the Contract in its entirety, then the County's "termination" of the Contract and right to finish the Work itself would be unconditional, rather than conditioned on the Surety's right to perform and complete the Contract.  That is, although Section 14.2.1 of the General Conditions provides that the County may "terminate the Contract" for any of the specified for-cause reasons, Section 14.2.2 immediately thereafter clarifies that "when any of [those] reasons exist," the County may "terminate employment of the Contractor," subject to the surety's prior rights.  Harmonizing these two sections in the General Conditions mandates a determination that an Owner's for-cause termination of a Contractor's employment does not, without more, constitute termination of the Contract, *even if* the Owner in its correspondence with the Surety characterizes its termination of the Contractor's employment as "termination" of the Contract.  To construe the County's right to terminate Prime's employment as also constituting termination of the Contract in its entirety would be at odds with the Surety's rights to perform and complete the Contract.  Furthermore, a different statute in Chapter 2253—Section 2253.071—expressly contemplates that a surety might indeed "complete" a public work contract after a contractor's right to proceed with performance has been "lawfully terminated."  *See* Tex. Gov't Code § 2253.071(a), (c).  That section prohibits the payment of contract proceeds to a contractor whose right to proceed with

performance has been lawfully terminated until all the costs of completion of the contract are paid by the contractor or *its surety*, and it grants to the surety who "completes" a contract a claim "to the proceeds of the contract" that is superior "to all other creditors of the prime contractor to the full extent of the surety's loss." *See id.* Reading the entirety of the General Conditions and Bond together, in the context of Chapter 2253, supports the conclusion that the parties intended the Contract to survive Prime's default and termination from the Project.

Second, the Bond provides for two conditions precedent to Great American's obligations thereunder: the County must (1) "declare[] a Contractor Default, terminate[] the Construction Contract[,] and notif[y] the Surety; and (2) "agree[] to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract."[4] *See Beard Fam. P'ship*, 116 S.W.3d at 844 (defining condition precedent to party's obligation to perform as "an act or event that must occur after the making of a contract before a right to immediate performance arises and before there may be a breach of a contractual duty"). Whether this latter condition occurred is not in the record.[5] However, regardless of whether the County complied with that condition, under common law when a contract provides for a condition precedent to a party's obligation to perform, a cause of action under the contract does not accrue and the statute of limitations does not begin to run until the condition is performed. *See Cummins & Walker Oil Co. v. Smith*, 814 S.W.2d 884, 886 (Tex. App.—San Antonio 1991, no writ). In other words, the right or

---

[4] Section 5 of the Bond reiterates that these two events are conditions precedent: "When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions . . . ."

[5] The County pleaded that all conditions precedent to its bond claim had occurred, and Great American in its answer denied that all conditions precedent had occurred.

17

cause of action requires both the existence of the right and the facts sufficient to constitute a cause of action. *See id.* at 887.

To construe the word "termination" in Section 2253.078—in the context of the Contract, the Bond, and the parties' intentions expressed therein—to mean merely termination of the Contractor's employment could result in the absurd situation of a cause of action under the Bond accruing without Great American's ever being obligated to perform on the Bond. That is, a cause of action could statutorily accrue against the surety even though under the common law no cause of action would yet accrue until, and if, both (1) the surety becomes liable under the bond (that is, the conditions precedent have occurred), *see id.* at 886, and (2) the Owner has suffered a legal injury. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam) (noting general rule that cause of action accrues when wrongful act causes legal injury); *see also Geters v. Eagle Ins.*, 834 S.W.2d 49, 50 (Tex. 1992) ("The liability of a surety is determined by the language of the bond itself."). A cause of action cannot accrue until there has been an alleged wrongful act and concomitant legal injury, *see Etan Indus.*, 359 S.W.3d at 623, and if the legislature intended by Section 2253.078 that a cause of action could accrue *before* a surety has committed a wrongful act, that intention would be more clearly evident in the statute.

It is black-letter law in Texas that "[b]efore it can be said that a cause of action exists in a legal sense, there must be such a mature right as may be declared upon and maintained, subject only to such valid defenses by which it may be defeated." *American Exch. Nat'l Bank of Dall. v. Keeley*, 39 S.W.2d 929, 935 (Tex. App.—Dallas 1931, writ dism'd w.o.j.). The accrual of a cause of action "means the right to institute and maintain a suit; and whenever one person may sue another a cause of action has accrued, and the statute begins to run." *Id.* "The statute of limitations begins to run from the time when a complete cause of action

18

accrued—that is, when a suit may be maintained—and not until that time." *Id.* Thus, generally the statute of limitations "can only be put in motion . . . when the right or cause of action accrues, and not before, and this does not exist until facts have arisen which authorize a person asserting a claim to obtain relief from some court of justice against the person liable on the alleged cause of action." *Id.* While it is true that an accrual date prescribed by statute governs over the general rule that a cause of action accrues and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy, *Southwestern Energy Prod.*, 491 S.W.3d at 721, when construing the statutorily prescribed "termination" date consistently with the parties' intent as expressed in the Contract and Bond, the only reasonable conclusion is that which aligns with the general common-law rule of accrual: that the parties intended the Contract to survive the Contractor's default and termination from the Project to allow the surety the opportunity to perform and complete the Contract, itself, and thus an opportunity to *fail* to complete its bond obligations before the Owner determines whether to invoke its legal remedies.

Third, even though the Bond specifies that when the Owner "terminates the Construction Contract" the Surety is entitled under Section 4 of the Bond to choose one of the specified options, among those options is the Surety's right to complete the Construction Contract, an impossible task if the Contract had truly been terminated in its entirety rather than surviving the Contractor's default. Furthermore, should the Surety elect option three—to obtain bids or negotiated proposals from qualified contractors acceptable to the County—such option expressly contemplates the execution of an entirely *new* contract and the issuance of entirely *new* performance and payment bonds, rather than performance and completion of the original Contract, which options one and two do expressly contemplate: Under option three, the Surety may "obtain bids or negotiated proposals from qualified contractors acceptable to the Owner *for*

19

*a contract for performance and completion of the Construction Contract*," "to be secured with performance and payment bonds . . . equivalent to [those] issued on the Construction Contract." (Emphasis added.)[6] Had the parties intended that the Contract be terminated in its entirety upon Prime's default regardless of the option the Surety chose, they likely would have required the execution of a new contract and new bond for options one and two as well, but they did not so provide.

Fourth, if the County's declaration of a Contractor default constituted termination of the Contract in its entirety, then the one-year limitations period would begin running upon termination of the Contractor's employment *even if* the Surety elected option one or two: to arrange for Prime to complete the Contract or undertook to complete the Contract itself. That scenario would require the County to be in the unenviable position of having to file suit against the Surety *even while the Surety was performing its completion duties under the Bond and even without knowing whether it had suffered or would suffer a legal injury*. Moreover, the legislature could have specified that the statute of limitations begins running when the County terminates a *Contractor* from a Project, rather than when a public work *contract* is terminated, given that it has defined a "prime contractor" in Section 2253.001. *See* Tex. Gov't Code § 2253.001. However, the legislature did *not* specify that the Contractor's termination is what triggers the one-year limitations period; rather, it specified that termination—or abandonment or final completion—of the public work *contract* is the relevant trigger. *See id.* § 2253.078(a). We must presume that the legislature chose its terms intentionally. *See Crosstex Energy Servs., L.P. v.*

---

[6] Compare option three with options one and two, which provide, respectively, that the Surety may either (1) arrange for the Contractor, with the consent of the Owner, to "perform and complete the Construction Contract"; or (2) undertake to "perform and complete the Construction Contract itself, through its agents or independent contractors."

*Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) ("We presume the Legislature chose statutory language deliberately and purposefully.").

Finally, the parties included a limitations period in Section 11 of the Bond, providing that the County must file suit within two years of the earliest of (1) a declaration of Contractor default, (2) the Contractor's cessation of work, or (3) the Surety's refusal or failure to perform its obligations. Although the parties may not contractually extend a statutorily provided limitations period to file suit on a bond, *see Transamerica Ins. v. Housing Auth. of City of Victoria*, 669 S.W.2d 818, 822 (Tex. App.—Corpus Christi–Edinburg 1984, writ ref'd n.r.e.), the inclusion of Section 11—and its generous provision of two years from the earlier of the Contractor's default or cessation of work or the Surety's refusal or failure to perform—supports the conclusion that the parties intended that the Surety have ample time to consider and choose an option, including option one or two, and then carry out such option to completion before the County would be required to determine whether the Surety had breached its obligations and rush to the courthouse. This is especially so given that the Contract required Prime to achieve substantial completion of the Work within 335 days and final completion within 30 days thereafter (i.e., within a year after commencement of the Work). If Prime had been declared to be in default early in the one-year period, and the County were required to file suit within one year of such default—which is what Great American argues the statute requires—such limitations period would require the County to file suit presumably well before the Surety had a chance to finish the Contract, despite its express right to do so. The Bond's limitations period reflects an intention by the parties that the Surety would have sufficient time to make an informed election under the Bond and, should it elect to perform and complete the Contract, would have sufficient time to in fact perform and complete the Contract before the County must

21

determine whether the Surety is in default. Construing the statute's phrase "termination of the public work contract" to mean the Surety's election, as occurred here, to waive its right to perform and complete the Contract harmonizes the statute with the intention exhibited in the parties' contractually provided limitations period.

We conclude that Great American failed to conclusively establish that the one-year limitations period had expired before the County filed suit.

## CONCLUSION

We affirm the trial court's order denying Great American's motion for summary judgment.

_____
Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump
  Dissenting Opinion by Justice Theofanis

Affirmed

Filed: July 24, 2025

22